OPINION
{¶ 1} This matter is before us on the appeal of attorney, Frank Payson, from a decision requiring Payson to pay opposing counsel $3,832 in attorney fees for a violation of Civ. R. 11. In support of his appeal, Payson presents the following single assignment of error:
 {¶ 2} "I. The trial court abused its discretion by finding that Appellant willfully violated Rule 11 and by sanctioning Appellant."
 {¶ 3} After considering the record and applicable law, we find that the assignment of error has merit. Accordingly, this matter will be reversed and remanded for further proceedings.
 {¶ 4} Frank Payson is the attorney of record for John Sandberg in a civil action that Sandberg brought against John T. Crouch Company, Inc., dba Crouch Fire Safety Products (Crouch), and Joy Oxley, who was Chairman of the Board for Crouch. Sandberg alleged in the complaint that he was employed as President of Crouch in January, 2000, and was improperly terminated In December, 2000. The claims against Crouch and Oxley included breach of contract, quantum meruit, unjust enrichment, sexual harassment, sex discrimination, and defamation.
 {¶ 5} From the beginning, the litigation was marked by acrimony and aggressive, sometimes unsuccessful pleadings and motions on both sides. For example, on November 2, 2004, attorney, Lynnette Pisone Ballato, filed an answer on behalf of Defendants, and attached a number of unauthenticated tax forms to the answer. Almost immediately thereafter, Ballato moved for judgment on the pleadings with regard to any employment-based claims brought under R.C. Chap. 4112, on the grounds that the tax forms indicated that Sandberg could not possibly have been a Crouch employee. These tax forms apparently came into Ballato's possession during a prior action that Sandberg had filed in July, 2001, and had dismissed without prejudice on September 30, 2003. See Defendant's motion for judgment on the pleadings, pp. 1 and 3, n. 1; the deposition of John Sandberg, pp. 564-66; and Montgomery County Common Pleas Court Case No. 2001 CV 3544. However, Sandberg had never been deposed in the prior action; the forms were simply turned over during discovery.
 {¶ 6} Ohio follows the well-established principle that courts may not consider evidentiary matters in ruling on motions to dismiss or motions for judgment on the pleadings. Estate ofSherman v. Millhon (1995), 104 Ohio App.3d 614, 617-618,662 N.E.2d 1098. Consistent with this principle, the trial court overruled the motion for judgment on the pleadings, noting that such motions present questions of law, and that the court needed "some evidence before it" in order to decide if the parties were involved in an employer/employee relationship.
 {¶ 7} After the trial court overruled the motion, the parties filed deposition notices and began proceeding with discovery, which had a cut-off date of October 11, 2005. In May, 2005, both sides filed motions for protective orders, accusing each other and their respective attorneys of unprofessional conduct and harassment. These motions followed the 15 hour deposition of John Sandberg and four hours of the deposition of Joy Oxley, which Ballato had suspended on May 5, 2005, after a disagreement with Payson.
 {¶ 8} We have reviewed all the depositions and portions of the videotape of the depositions. Unfortunately, both attorneys exhibited less than courteous conduct on numerous occasions. John Sandberg's deposition began amicably, but deteriorated into rancor several times. For example, at page 152 of the deposition, Payson objected to a question, and the following exchange occurred:
 {¶ 9} "Ms. Ballato: I said that he could remember, Frank. I don't know how else I could ask the question.
 {¶ 10} "Mr. Payson: Lynnette, you don't need to raise your voice. We're not —
 {¶ 11} "Ms. Ballato: Well, this is ridiculous.
 {¶ 12} "Mr. Payson: — I mean, we're professionals. You don't need to raise your voice. It's not necessary.
 {¶ 13} "Ms. Ballato: This is ridiculous. You're interrupting." John Sandberg deposition, taken on April 22, 2005, p. 152.
 {¶ 14} Payson objected about 39 times during a deposition of 166 pages, and interrupted only about ten times, generally to instruct his client on such matters as allowing opposing counsel to finish her questions, or to slow down. As will become evident later, Ballato interrupted and objected significantly more when her client was deposed.
 {¶ 15} The acrimony increased during later deposition sessions. For example, the following exchange occurred while Ballato was questioning Sandberg:
 {¶ 16} "Q.: Did you tell Clayton about Gladys?
 {¶ 17} "Mr. Payson: Objection with the tone already. Please don't — it's argumentative. It's abusive. It's offensive. Tone it down, please.
 {¶ 18} "Ms. Ballato: Okay.
 {¶ 19} "Mr. Payson: Be professional, if you can be." Deposition of John Sandberg, taken on April 29, 2005, p. 443.
 {¶ 20} This type of comment between counsel is disrespectful and unwarranted. On another occasion in the same deposition, the following dialogue took place:
 {¶ 21} "Q.: So that I thought your sexual orientation wasn't relevant in business situations. Did you make a point to, quote, come out at Crouch in November of 2000?
 {¶ 22} "Mr. Payson: Objection. He doesn't say come out of the closet, he said come out.
 {¶ 23} "Ms. Ballato: That's what I said, come out.
 {¶ 24} "Mr. Payson: Now, don't raise your voice to me, you know —
 {¶ 25} "Ms. Ballato: Don't lead.
 {¶ 26} "Mr. Payson: Why don't you tone it down.
 {¶ 27} "Ms. Ballato: Don't lead. If you have an objection, make it.
 {¶ 28} "Mr. Payson: Be professional. I do have an objection to the way you're acting.
 {¶ 29} "Ms. Ballato: You're obstreperous. You're obstreperous.
 {¶ 30} "Mr. Payson: Obstreperous, what does that mean?
 {¶ 31} "Ms. Ballato: God.
 {¶ 32} "Mr. Payson: Behave yourself.
 {¶ 33} "Ms. Ballato: Oh —
 {¶ 34} "The Witness: In this instance —
 {¶ 35} "Ms. Ballato: — you know what?
 {¶ 36} "Mr. Payson: What?
 {¶ 37} "Ms. Ballato: I think you should understand that the Judge does not want you disrupting my discovery depositions after the talk we had yesterday.
 {¶ 38} "Mr. Payson: My job is to protect the client from abusive questioning and I'm sorry but you're —
 {¶ 39} "Ms. Ballato: I repeated his question — I repeated his response that he volunteered.
 {¶ 40} "Mr. Payson: He did not say anything about coming out of the closet." Id. at 457-58.
 {¶ 41} As we mentioned, Sandberg was deposed over three days, for about fifteen hours. During the third part of the deposition, which lasted all day, and resulted in a 247 page written transcript, Payson objected only about 44 times. Most objections were not "speaking objections." Seven objections related to the same topic, i.e., Sandberg's sexual orientation, and resulted in a sealed record on the point. Payson did not interrupt the proceedings often, and when he did, it was generally to instruct his client on matters such as letting opposing counsel finish her question. Id. at p. 416.
 {¶ 42} Sandberg's deposition was followed by the deposition of Joy Oxley on May 5, 2005. This deposition session lasted about four hours. At the outset, the attorneys argued about future depositions, and continued to show a general lack of civility toward each other.
 {¶ 43} Oxley's four hour deposition was transcribed into 164 written pages. During this deposition, Ballato objected around 146 times and interrupted the questioning to interject her own testimony or extraneous comments about 47 other times. Ballato also instructed her client not to answer questions at least 28 times, and made various "speaking" objections. Many objections were disruptive and were unnecessary in the context of discovery depositions. An example of such unnecessary objections is the following exchange, which occurred when Oxley was being questioned about actions of her ex-husband, Richard:
 {¶ 44} "Q.: Do you remember when this occurred, what year?
 {¶ 45} "A.: What year?
 {¶ 46} "Q.: Yeah.
 {¶ 47} "A.: "99.
 {¶ 48} "Q.: All right. And what was his position in the company business at that time?
 {¶ 49} "A.: He was president.
 {¶ 50} "Q.: And what was your position?
 {¶ 51} "Ms. BALLATO: Objection. Assuming she had one. Go ahead.
 {¶ 52} "THE WITNESS: I think I was secretary on the Board of Directors, secretary treasurer on the Board of Directors." Joy Oxley deposition of May 5, 2005, p. 36.
 {¶ 53} Certainly Oxley's own attorney would have been aware before the deposition of dates that her client held positions at Crouch. Therefore, there was no need to make this type of objection if the time period coincided — which, clearly, it did. Had this sort of objection occurred only a few times, it would not have been notable. However, there were repeated instances, with many pages of Oxley's deposition revealing unnecessary objections to nearly every question. Another example would be the following exchange:
 {¶ 54} "Q.: Okay. In 1999 and 2000, what positions did you hold at Crouch?
 {¶ 55} "Ms. BALLATO: Objection as to time and scope. Go ahead." Id. at 70.
 {¶ 56} Ballato also improperly interjected her own testimony and comments at many points. One such instance occurred when Joy Oxley was questioned about the office John Sandberg occupied when he was president of Crouch. At that time, both Joy Oxley and her former husband, Rich Oxley, owned interests in Crouch. Rich Oxley had also served as president of Crouch before Sandberg became president.
 {¶ 57} During the deposition, Joy Oxley testified that she had repainted the office where her former husband worked, had bought a new desk for Sandberg, and had hung some of her own artwork in Sandberg's office. The following exchange then occurred:
 {¶ 58} "Q.: Was there a fireplace in his office?
 {¶ 59} "A.: I mean it doesn't operate. It had been a gas fireplace at one time or it had a little gas stove. These are really old buildings.
 {¶ 60} "Q.: I haven't seen it, so I don't know.
 {¶ 61} "MS. BALLATO: Luxurious is not how we would describe it. If you have that impression, that's wrong.
 {¶ 62} "THE WITNESS: Slummy is more of the word. * * *
 {¶ 63} "Q.: Did John's office have a computer stand?
 {¶ 64} "A.: Yes, or a computer table?
 {¶ 65} "Q.: And a desk?
 {¶ 66} "A.: Yes.
 {¶ 67} "Q.: Wet bar?
 {¶ 68} "A.: Yeah, that was left over from —
 {¶ 69} "Q.: Screened-in porch?
 {¶ 70} "A.: Well, that's putting it nicely. It was sort of a balcony more so than anything. I guess it had screening on it. I think you'd take your life in your own hands to walk on it. It's not someplace you'd want to hang out.
 {¶ 71} "MS. BALLATO: I wouldn't even say for show. This description is laughable in connection to what the office was like." Id. at 140-41.
 {¶ 72} As we mentioned, both attorneys were also rude at various points. After their initial dispute over scheduling depositions, the attorneys next argued about whether Oxley could be asked if she had ever lied. During this argument, the following exchange took place:
 {¶ 73} "MS. BALLATO: She is going to follow my instructions and she's not going to answer the question. We're going to wait for another question.
 {¶ 74} "MR. PAYSON: Lynn, if this continues, we're not going to get very far because we're going to have to call the judge.
 {¶ 75} "MS. BALLATO: Do what you think is best.
 {¶ 76} "MR. PAYSON: You know this is a valid question. It goes to credibility. This is a discovery deposition, as the judge told you yesterday.
 {¶ 77} "MS. BALLATO: Actually he was telling you.
 {¶ 78} "MR. PAYSON: He told you.
 {¶ 79} "MS. BALLATO: He was telling you." Id. at p. 17.
 {¶ 80} Subsequently, Payson took offense at what he considered to have been a "smart remark" from Ballato, and asked her, as he had before, if she was "going to behave." At that point, Ballato threatened to walk out and accused Payson of treating her like a child. However, Ballato was also not without fault, as her remarks repeatedly implied that Payson was incompetent. An example of this is depicted in the following exchange, when Payson was asking Oxley about the corporate headquarters of Crouch:
 {¶ 81} "Q.: Corporate headquarters is located where?
 {¶ 82} "MS. BALLATO: Objection. Assuming that there are other headquarters. Go ahead.
 {¶ 83} "THE WITNESS: Corporate headquarters of Crouch?
 {¶ 84} "BY MR. PAYSON:
 {¶ 85} "Q.: Yes. Is there more than one headquarters?
 {¶ 86} "MS. BALLATO: Objection. If there is a corporate headquarters, go ahead.
 {¶ 87} "BY MR. PAYSON:
 {¶ 88} "Q.: Is there a corporate headquarters?
 {¶ 89} "A.: There's a building and a business, but that's it. There's no glamorous thing or anything. * * *" Id at 47-48.
 {¶ 90} Again, the above excerpt is just a small sample of what occurred. Oxley's deposition was filled with such exchanges. During other parts of the deposition, Ballato described Payson's questioning as "unbelievable," lectured him on mistakes he was making, rephrased questions, and told Payson how to conduct the deposition. By the same token, Payson asked Ballato to lower her voice and told her not to raise it for the balance of the day.
 {¶ 91} As we noted, Ballato terminated the deposition after about four hours and walked out. Subsequently, on June 21, 2005, the trial judge held a hearing and attempted to resolve the discovery disputes. We have reviewed the entire video of this hearing.
 {¶ 92} At the hearing, the judge stated that both attorneys were really nice people, but that there had been a lot of name-calling and finger pointing. The judge offered the use of his conference room for depositions, so that he could be available if further disputes arose. From the discussion at the hearing and the judge's comments, it appears that the judge did not blame one side over another, but simply asked the attorneys to cooperate with each other and conduct themselves professionally. The judge also did not require that depositions be held at the courthouse; he simply offered that as an option.
 {¶ 93} On July 18, 2005, the deposition of Joy Oxley recommenced, in the courthouse, before a videographer, with both attorneys again engaging in the same type of conduct. During a deposition of about 217 pages, Ballato objected around 203 times, interrupted many times, and continued with "speaking objections." At the very beginning of the deposition, an argument erupted, as follows:
 {¶ 94} "VIDEOGRAPHER: We're on the record.
 {¶ 95} "MR. PAYSON: It's in my space.
 {¶ 96} "MS. BALLATO: It's not in your space, Frank. It's in the middle of the table. I will pull my yardstick out to measure it.
 {¶ 97} "Stop it.
 {¶ 98} "WHEREUPON:
 {¶ 99} "JOY OXLEY, of lawful age, witness herein, after first being duly sworn as hereinafter certified, testified as follows:
 {¶ 100} "MR. PAYSON: Behave yourself.
 {¶ 101} "MS. BALLATO: Are we on the tape? Did we get Mr. Payson telling me to behave myself already? Thank you." Deposition of Joy Oxley, taken on July 18, 2005, p. 170.
 {¶ 102} At pages 254-255 of the deposition, the following exchange occurred:
 {¶ 103} "Q.: * * * I notice we are at noon when I indicated we would break for lunch. Is this a convenient time to break?
 {¶ 104} "MS. BALLATO: It doesn't matter to me.
 {¶ 105} "MR. PAYSON: Why don't we go ahead and break and come back, say, about 1:30.
 {¶ 106} "MS. BALLATO: I'd prefer to come back at 1. I'd prefer to keep moving today.
 {¶ 107} "MR. PAYSON: I understand.
 {¶ 108} "MS. BALLATO: So we will return at 1.
 {¶ 109} "MR. PAYSON: 1:30.
 {¶ 110} "MS. BALLATO: I'm not taking — hold on, let's just stay on record. I don't see any reason to take an hour and a half break for lunch. We are scheduled to try to get as much done today as we can. You wanted the whole day set aside.
 {¶ 111} "MR. PAYSON: We are not going to finish today.
 {¶ 112} "MS. BALLATO: I have the whole day aside for this. I would like to get as much done today as possible.
 {¶ 113} "MR. PAYSON: That's why —
 {¶ 114} "MS. BALLATO: So that's what we agreed upon.
 {¶ 115} "MR. PAYSON: — Right.
 {¶ 116} "MS. BALLATO: So I would like to return at 1.
 {¶ 117} "MR. PAYSON: Well, I will compromise with you and say 1:15, but it's going to be difficult to get back at 1 o'clock. We will say 1:15.
 {¶ 118} "MS. BALLATO: It's difficult to get back downtown. Your office is downtown.
 {¶ 119} "MR. PAYSON: I'm not going to argue with you. It's 1:15 or 1:30.
 {¶ 120} "MS. BALLATO: That's ridiculous."
 {¶ 121} We have reviewed this deposition, and have found that both attorneys were argumentative, made offensive comments to each other, and engaged in acrimonious exchanges.
 {¶ 122} When the Oxley deposition continued the following day, the same pattern of conduct occurred. Ballato objected about 109 times during the 105 page deposition, interrupted about another 37 times, and made arguments and objections that delayed the deposition. One such interruption occurred when Payson was questioning Oxley about her knowledge of Sandberg's sexual orientation. Payson asked Oxley when she first suspected that Sandberg was homosexual, and Oxley replied that she could not provide a date. Oxley then said that she gradually became aware of Sandberg's sexual orientation. At this point, the following exchange occurred:
 {¶ 123} "Q.: What happened in the fall of 1999 to trigger your suspicions?
 {¶ 124} "MS. BALLATO: Object to the word triggering.
 {¶ 125} "THE WITNESS: Yeah, it —
 {¶ 126} "MR. PAYSON: What's the matter with the word?
 {¶ 127} "MS. BALLATO: It mischaracterizes her testimony.
 {¶ 128} "THE WITNESS: I think it was just sort of a gradual.
 {¶ 129} "MS. BALLATO: Joy, you don't need to tell him how to answer — ask his questions. If you have a — are you going to leave the question triggered, and we'll object to it, and you answer it the best you can, or you can rephrase it.
 {¶ 130} "MR. PAYSON:
 {¶ 131} "Q.: Go ahead, ma'am.
 {¶ 132} "MS. BALLATO: Objection to the question. Go ahead.
 {¶ 133} "THE WITNESS: Ask it again.
 {¶ 134} "BY MR. PAYSON: Do you know what trigger means?
 {¶ 135} "MS. BALLATO: Let's have the question read back.
 {¶ 136} "MR. PAYSON: She understands the word.
 {¶ 137} "THE WITNESS: Um-hmm.
 {¶ 138} "MS. BALLATO: It's not a question. It's not a question about her not understanding the word, it's a matter of the word being misused and mischaracterizing her testimony.
 {¶ 139} "Ma'am, would you read the question back, please?
 {¶ 140} "(WHEREUPON, the requested portion of the record was read.)
 {¶ 141} "MS. BALLATO: Objection to the form. Go ahead, Joy.
 {¶ 142} "THE WITNESS: Yes, it wasn't like suddenly a light bulb went on suddenly. It was, it was the way John was acting with Clayton when he first brought Clayton into the company and also me getting comments from other people about it." Deposition of Joy Oxley, taken on July 19, 2005, at pp. 419-20.
 {¶ 143} At various points, Ballato also made comments like, "Are you going to have any new questions today?"; "As if that question hadn't been asked and answered before"; "You can continue to waste your time in this fashion, but I don't do work to prosecute your claim. If you were prepared for this deposition proceeding you would be able to know what you've done if you had ordered the deposition of your client"; and "you haven't done any work." For his part, Payson lectured Ballato on raising her voice, and asked that she not coach the witness.
 {¶ 144} Subsequently, in July, 2005, the attorneys engaged in a dispute about deposition scheduling. Ballato's office provided dates for depositions of witnesses, to be taken in August, 2005. Payson sent a letter confirming the dates and stating that the depositions would be held in his office. However, Ballato's office responded by indicating that the depositions would be taken in her office or at the courthouse. Payson then filed notices indicating that the depositions would be held in his office. Ballato responded by filing additional notices, scheduling the depositions to take place in her office. The result of this inability to cooperate on a simple matter was that Payson canceled the depositions and filed another motion to compel discovery.
 {¶ 145} During the same time frame, Ballato sent Payson a letter on July 26, 2005, about other discovery issues. Payson responded on July 28, 2005, and described Ballato's July 26, 2005 letter as "largely incoherent." Payson also made insulting remarks about Ballato, stating that "[b]ecause of your continuing irrational tirades in this litigation, I am becoming increasingly concerned about your health. If there is anything I can do to help you in this regard, let me know." In reviewing these letters, we note that Ballato's letter of July 26, 2005 might be described as abrasive and untactful, but it was not incoherent or irrational.
 {¶ 146} On August 9, 2005, Ballato filed a motion for summary judgment on behalf of Defendants. The trial court had previously established a summary judgment deadline of August 9, 2005, and a final discovery cut-off of October 11, 2005. The trial itself was scheduled for November 11, 2005. When Ballato filed the summary judgment motion, the court ordered all responses to be filed by September 7, 2005. However, on August 23, 2005, Payson filed a motion under Civ. R. 56(F), asking the court to continue the obligation to respond until such time as he could complete discovery. Among other things, Payson mentioned that he had a pending motion to compel and had been unable to complete the depositions that were scheduled.
 {¶ 147} On September 1, 2005, Ballato responded to the motion to compel, and attached various correspondence, including Payson's letter of July 28, 2005. Ballato also filed a memorandum in opposition to the motion to continue. Subsequently, on September 16, 2005, Payson filed a motion to disqualify Ballato and her law firm as counsel of record. This motion was based on Ballato's alleged improper contact with Sandberg, and was supported by an affidavit that Sandberg had signed.
 {¶ 148} In the affidavit, Sandberg stated that he had maintained an Instant Messenger (IM) account with America Online (AOL) in the winter of 2001 and the spring of 2002, using the screen name "Johnny3588." Sandberg stated that he was contacted during that time by Ms. Ballato, who identified herself as an attorney. Ballato said that she was married, had a son, and lived in Oakwood, Ohio. Sandberg allegedly told Ballato various details, including his name, prior residence in Oakwood, and prior employment with Crouch Fire Safety. According to Sandberg, the IM conversation terminated after he revealed this information, and Ballato never contacted him again. However, Sandberg claimed that various individuals contacted his AOL screen name immediately thereafter. Sandberg alleged that these uninvited contacts sought information about his sexual orientation, and included propositions for sexual acts. Sandberg further alleged that this activity was directed by Ballato, who was collecting information about Sandberg's pending litigation with Crouch. (This would have been the previous action that was filed in 2001 and dismissed in 2003.)
 {¶ 149} Ballato responded to this information with a motion to strike the motion to disqualify, a motion to dismiss for failure to prosecute, and a motion for Rule 11 sanctions, all filed in a single document on September 22, 2005. Ballato attached her own affidavit, in which she claimed that Sandberg's affidavit was completely false. Ballato stated that she had never had extra-judicial contact with Sandberg. She also said she had never established a screen name, nor had she communicated with a screen name in any way. She stated that she did not even know how instant message accounts worked.
 {¶ 150} Ballato also attached several documents to the motion. These documents included excerpts from two depositions, in which Payson had told her to behave herself; the July 28, 2005 letter in which Payson had insulted her; and an earlier letter in which Payson had complained that Ballato had falsified and misrepresented their communications.
 {¶ 151} On September 28, 2005, the trial court filed a decision, entry, and order overruling the motion to disqualify and sustaining the motion to strike. The court also granted the motion for Rule 11 sanctions against both Payson and Sandberg, and set a hearing for October 21, 2005, to determine attorney fees and costs. In its decision, the court concluded that the information in Sandberg's affidavit was either "a figment of his imagination or an outright fabrication." The court chastised Payson for filing Sandberg's affidavit without confirming its truth. The court also noted that part of Payson's litigation strategy appeared to be embarrassment and humiliation of opposing counsel. Citing R.C. 2323.51, the court further concluded that Sandberg's actions could be for no other purpose than to harass or maliciously injure the Defendants or Ballato. Accordingly, the court found that Payson and Sandberg intended to cause professional harm to Ballato and to harass her by filing a frivolous motion to disqualify.
 {¶ 152} The above observations were made by the trial court without the benefit of a hearing, and without Sandberg or Payson having been given an opportunity to respond to the motions. In fact, the court's decision was filed only six days after Ballato's motions were filed. The court did hold a hearing on fees, and subsequently filed an entry on November 4, 2005, assessing $3,832 in attorney fees against Payson. This amount represented 46.70 hours Ballato had spent responding to the motion to disqualify.
 {¶ 153} In pertinent part, Civ. R. 11 provides that:
 {¶ 154} "Every pleading, motion, or other document of a party represented by an attorney shall be signed by at least one attorney of record * * *. * * * The signature of an attorney orpro se party constitutes a certificate by the attorney or party that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a document is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the document had not been served. For a willful violation of this rule, an attorney or pro se party, upon motion of a party or upon the court's own motion, may be subjected to appropriate action, including an award to the opposing party of expenses and reasonable attorney fees incurred in bringing any motion under this rule. Similar action may be taken if scandalous or indecent matter is inserted."
 {¶ 155} Decisions imposing sanctions are reviewed for abuse of discretion. Toth v. Toth (1994), 94 Ohio App.3d 562, 565,641 N.E.2d 254. An abuse of discretion means that the trial court's attitude was arbitrary, unreasonable, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140. However, we have stressed before that decisions are unreasonable if they are not supported by a sound reasoning process. See, e.g., Jackson v. Jackson (2000),137 Ohio App.3d 782, 799, 739 N.E.2d 1203, citing AAAA Enterprises, Inc. v.River Place Community Urban Redevelopment Corp. (1990),50 Ohio St.3d 157, 161, 553 N.E.2d 597.
 {¶ 156} Before ruling on a motion for sanctions, a "`trial court must conduct a hearing * * * and may not rely exclusively on what has or has not been submitted with the motion itself.'"Rondini v. Seman, Lake App. No. 2002-L-017, 2002-Ohio-6590, at ¶ 7, quoting from Cic v. Nozik (July 20, 2001), 11th Dist. No. 2000-L-117, 2001 WL 822465, at 2. Thus, "the trial court must provide the party opposing sanctions an opportunity to establish a good-faith basis for filing the pleading at issue." Id.
 {¶ 157} In this regard, the Tenth District has explained that:
 {¶ 158} "The fact that the hearing should provide the opportunity for the attorney to demonstrate his or her good-faith basis for the pleading implies that evidence will be received by the trial court. Normally this will be done through live testimony by the attorney who filed the pleadings. If the parties and the attorney who filed the pleadings agree, the evidence may be received through use of affidavits, deposition testimony or stipulation." In re Estate of Cain (1994), 92 Ohio App.3d 835,839, 637 N.E.2d 362.
 {¶ 159} Although parties can agree to submit motions based on the record and affidavits, this is far different from a trial court sua sponte granting motions for sanctions without allowing the opposing side an opportunity to defend itself.McCutcheon v. Brooks (1988), 37 Ohio App.3d 110, 112,524 N.E.2d 202.
 {¶ 160} In the present case, there was no agreement to submit the motion through written materials. Furthermore, no hearing was provided, and Payson was not even given a chance to respond to the motion. Accordingly, the trial court erred in granting sanctions under these circumstances.
 {¶ 161} Defendants argue that Payson waived any error by failing to file a motion for reconsideration before the damages hearing. In this regard, Defendants note that the decision on sanctions was not final until the trial court awarded damages, which did not occur until November 4, 2005. We disagree that the error was waived. If we required motions for reconsideration as a predicate for later appeal, we would force trial courts to waste significant amounts of time reviewing issues they have already considered. Opposing parties would also object to the additional expense of responding more than one time.
 {¶ 162} Nonetheless, even if the error had been waived, we would consider it under the plain error doctrine. Gevedon v.Gevedon, Greene App. No. 2005-CA-82, 2006-Ohio-3195, at ¶ 20
("`Civil plain error is error which, though not objected to, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the judicial process itself.'" Citation omitted.) Granting sanctions against a party without permitting a response seriously affects the basic fairness of the judicial process. As a final matter, we note that our discussion should not be construed as an opinion on the merits of the motion for sanctions. If Sandberg's affidavit is false, and Payson failed to adequately investigate, that would be reprehensible conduct warranting sanctions. On the other hand, if adequate investigation were done, or the allegations were true, sanctions would not be warranted. These matters cannot be decided on the basis of two conflicting affidavits. We have examined the record at some length in an attempt to be fair to both sides.
 {¶ 163} In ruling on the motion for sanctions, the trial court indicated that it had reviewed the exhibits attached to Defendant's motion, and had found Payson's comments in correspondence and in depositions to be demeaning. We do not disagree with that finding. However, Payson was never given an opportunity to respond, or to bring other parts of the record to the court's attention. A court can only base its opinion on what it sees, or allows itself to see.
 {¶ 164} Defendants also contend in their brief that Plaintiff's counsel falsely portrayed Ms. Ballato as being loud and belligerent, and attacked her personally in order to discredit her in the eyes of the court. In order to assess the validity of these claims, we reviewed the entire record, including parts of the videotape. In doing so, we found that matters were not completely one-sided. Incivility breeds incivility, and disrespect breeds disrespect. We have no idea what started this battle, or why, but the lack of cooperation and civility on both sides is nothing to which any attorney should aspire. If the trial court had allowed Payson to respond, the court may still have reached the same conclusions about the conduct of Mr. Payson and his client. However, since Payson did not have an opportunity to respond or to defend his actions in an evidentiary hearing, the trial court's decision was not based on a sound reasoning process. Jackson, 137 Ohio App.3d at 799.
 {¶ 165} Based on the preceding discussion, the single assignment of error is sustained. The judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion.
Wolff, J., and Fain, J., concur.